**133 Nev., Advance Opinion 38**

# IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF THE PARENTAL
RIGHTS AS TO R.T., K.G.-T., N.H.-T.
AND E.H.-T., MINOR CHILDREN.

———————————————————

JACQUELINE G.,
Appellant,
vs.
WASHOE COUNTY DEPARTMENT OF
SOCIAL SERVICES,
Respondent.

No. 70210



FILED

JUN 29 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order terminating appellant's parental rights. Second Judicial District Court, Washoe County; Egan K. Walker, Judge.

*Affirmed.*

Jeremy T. Bosler, Public Defender, and John Reese Petty, Chief Deputy Public Defender, Washoe County,
for Appellant.

Christopher J. Hicks, District Attorney, and Tyler M. Elcano, Deputy District Attorney, Washoe County,
for Respondent.

———————————————————

BEFORE HARDESTY, PARRAGUIRRE and STIGLICH, JJ.

## OPINION

By the Court, PARRAGUIRRE, J.:

In this case, we are asked to determine whether one's parental rights may be terminated due to poverty and, if not, whether the district

 

court's termination order was improperly based on the appellant's poverty. We take this opportunity to clarify that poverty is not, and has never been, a valid basis for terminating one's parental rights. Additionally, we hold the district court's termination order was not predicated on the appellant's poverty and is supported by substantial evidence. Therefore, we affirm the district court's order.

## FACTS AND PROCEDURAL HISTORY

Appellant Jacqueline G. is a 26-year-old mother of four children: R.T., K.G.-T., N.H.-T., and E.H.-T. From October 2012 to April 2013, respondent Washoe County Department of Social Services (WCDSS) received several reports indicating Jacqueline did not have adequate housing for her children. WCDSS discovered that Jacqueline had changed residences several times, had been evicted from her most recent residence, and had exhausted all local resources for housing. As a result, R.T., K.G.-T., and N.H.-T. were removed from Jacqueline's custody in April 2013 and placed with a foster parent.

Jacqueline received a case plan, which required her to: (1) obtain and maintain housing; (2) obtain and maintain a stable income, either through welfare or employment; and (3) demonstrate that she could care for her children's basic needs (e.g., keep the home clean, pay her bills on time, and get the children to appointments and school on time). Jacqueline's case was also placed in a program that allowed her to receive assistance from the Children's Cabinet, a nonprofit agency that provides services to families in need.

On January 1, 2014, E.H.-T. was born. Shortly thereafter, Jacqueline was evicted from her apartment, and she eventually moved into a trailer with the father of her children. During this time, WCDSS received a report indicating Jacqueline's residence was not safe for the

child. An assessment worker visited the residence and observed a broken window, a broken glass door, a broken refrigerator, a knife on the counter, dirty dishes, and some trash and piles of clothes throughout the living room. However, E.H.-T. was not yet mobile, and the room where E.H.-T. slept was relatively clean and free of clutter. Therefore, E.H.-T. was not removed from Jacqueline's custody.

Following a domestic dispute, Jacqueline moved out of the trailer. Eventually, Jacqueline moved into a motel room, and an assessment worker scheduled a time to visit Jacqueline at the residence. The assessment worker observed significant clutter, animal feces and urine, and dirty diapers throughout the room. The assessment worker concluded that the environment posed a safety risk to E.H.-T. because E.H.-T. was now mobile. As a result, E.H.-T. was subsequently removed from Jacqueline's custody and placed with the foster parent. Jacqueline received another case plan, which was similar to her first case plan. In addition, Jacqueline was asked to participate in therapy and to undergo a psychosocial evaluation to ensure her purported depression and anxiety did not interfere with her ability to reunite with her children.

From October 2012 to July 2015, Jacqueline had resided in approximately 15 different shelters, apartments, and motels. Meanwhile, WCDSS and the Children's Cabinet provided Jacqueline with several services to help her find affordable housing, including referrals and assistance with the Reno Housing Authority, Section 8 housing, victim assistance programs, and low-income energy assistance programs. In addition, WCDSS and the Children's Cabinet helped Jacqueline find employment opportunities and apply for jobs. Nonetheless, Jacqueline quit, or was terminated from, almost every job she held within a month's time. WCDSS also referred Jacqueline to several mental health

professionals for evaluations and counseling. Many of these individuals testified that therapy would have helped treat Jacqueline's anxiety and depression. Although Jacqueline was referred to at least three separate therapists, services were discharged with each therapist after Jacqueline failed to attend appointments.

Ultimately, WCDSS concluded that Jacqueline had made minimal progress on her case plan goals. On July 17, 2015, WCDSS filed an amended petition to terminate Jacqueline's parental rights. A six-day bench trial was held, in which 21 witnesses testified, including Jacqueline, several social workers, and several mental health professionals. After the trial, the district court issued an order terminating Jacqueline's parental rights with respect to all four children. Specifically, the district court held: (1) Jacqueline failed to overcome NRS 128.109's presumptions with respect to R.T., K.G.-T., and N.H.-T.;[1] (2) Jacqueline demonstrated only token efforts to care for her children under NRS 128.105(1)(b)(6); and (3) the best interests of the children were served by termination. The district court specifically rejected Jacqueline's argument that poverty caused her failure to reunify with the children. Jacqueline now appeals the district court's order.

## DISCUSSION

On appeal, Jacqueline argues that the district court terminated her parental rights due to her poverty, and that poverty is not

---

[1]NRS 128.109 imposes a presumption that a parent has demonstrated only token efforts to care for his or her children and that the best interests of the children are served by termination if the children have resided outside of their home for 14 months of any 20 consecutive months. NRS 128.109(1)(a), (2).

a valid basis for terminating one's parental rights.[2] In response, WCDSS argues that the district court did not terminate Jacqueline's parental rights due to poverty, but due to her continued failure to comply with her case plan goals despite having the ability to do so.

We take this opportunity to clarify that poverty is not, and has never been, a valid basis for terminating one's parental rights. Generally, "[a] party petitioning to terminate parental rights must establish by clear and convincing evidence that (1) termination is in the child's best interest, and (2) parental fault exists." *In re Parental Rights as to A.L.*, 130 Nev., Adv. Op. 91, 337 P.3d 758, 761 (2014) (internal quotation marks omitted); *see also* NRS 128.105. In determining whether parental fault exists, the district court must find at least one of the following factors: "abandonment of the child; neglect of the child; unfitness of the parent; failure of parental adjustment; risk of injury to the child if returned to, or if left remaining in, the home of the parents; and finally, only token efforts by the parents." *In re Termination of Parental Rights as to N.J.*, 116 Nev. 790, 801, 8 P.3d 126, 133 (2000); *see also* NRS 128.105(1)(b)(1)-(6).

---

[2]Jacqueline also argues that the district court erred in terminating her parental rights because it did not find "serious harm" to any of her children. We reject this argument. We have never held that a district court must find "serious harm" to the children before terminating one's parental rights. Furthermore, although a finding of parental fault may be based on a "[r]isk of serious physical, mental or emotional injury to the child if the child were returned to, or remains in, the home of his or her parent," NRS 128.105(1)(b)(5), this specific form of parental fault need not be found in every termination case. *See* NRS 128.105(1)(b) (requiring the court to find at least one ground of parental fault). We also note that NRS 128.105 was amended in 2015, and that those amendments do not alter this court's disposition. 2015 Nev. Stat., ch. 250, § 3, at 1184-85.

Under Nevada law, a district court may not find parental fault if one's failure to care for his or her children is the result of a financial inability to do so. *See* NRS 128.106(1) ("In determining neglect by or unfitness of a parent, the court shall consider, without limitation, the following conditions which may diminish suitability as a parent . . . (e) [r]epeated or continuous failure by the parent, *although physically and financially able*, to provide the child with adequate food, clothing, shelter, education or other care . . . ." (emphasis added)); *see also* NRS 128.013(1)(c) (defining "injury" to a child's health or welfare as the failure to provide the child "proper or necessary subsistence, education or medical or surgical care, *although he or she is financially able to do so or has been offered financial or other reasonable means to do so*" (emphasis added)).

However, this principle does not prohibit the district court from considering a parent's failure to maintain housing or employment in contravention of a state-issued case plan. Indeed, we have previously affirmed termination orders in circumstances similar to the present matter. *See In re Parental Rights as to Daniels*, 114 Nev. 81, 83-85, 93-95, 953 P.2d 1, 2-3, 8-10 (1998); *Cooley v. Div. of Child & Family Servs.*, 113 Nev. 1191, 1192-99, 946 P.2d 155, 155-60 (1997); *In re Parental Rights as to Bow*, 113 Nev. 141, 143-51, 930 P.2d 1128, 1129-34 (1997).[3]

---

[3]We acknowledge that these cases have been overruled to the extent they relied on the jurisdictional/dispositional analysis announced in *Champagne v. Welfare Division of Nevada State Department of Human Resources*, 100 Nev. 640, 646-47, 691 P.2d 849, 854 (1984). *See In re Termination of Parental Rights as to N.J.*, 116 Nev. at 800 n.4, 8 P.3d at 132 n.4.

In each of these cases, (1) a parent received a case plan requiring him or her to, *inter alia*, maintain adequate housing and secure stable employment; (2) the district court terminated the parent's rights due, in large part, to the parent's failure to comply with the case plan despite reasonable efforts by the child welfare agency to facilitate reunification; and (3) Justice Charles Springer expressed concern in his dissenting opinion that poverty was an underlying cause of the termination. *In re Parental Rights as to Daniels*, 114 Nev. at 95-98, 953 P.2d at 10-12 (Springer, C.J., dissenting); *Cooley*, 113 Nev. at 1200-02, 946 P.2d at 160-62 (Springer, J., dissenting); *In re Parental Rights as to Bow*, 113 Nev. at 153-55, 930 P.2d at 1135-37 (Springer, J., dissenting). In addressing Justice Springer's concerns, this court's majority emphasized "that immaturity, poverty, and disability, . . . [were] *not* factors for our decision[s]" in termination of parental rights cases. *Cooley*, 113 Nev. at 1199, 946 P.2d at 160.

We reaffirm *Cooley* and the associated caselaw to the extent those cases hold, implicitly or explicitly, that poverty is not a basis for terminating one's parental rights. Furthermore, we hold that substantial evidence supports the district court's finding that Jacqueline's failure to reunite with her children was not due to her poverty. *See In re Termination of Parental Rights as to N.J.*, 116 Nev. at 795, 8 P.3d at 129 (stating this court does not "substitute its own judgment for that of the district court" and "will uphold termination orders based on substantial evidence").

In this matter, Jacqueline had over two years to comply with her case plan goals before WCDSS filed its amended petition to terminate her parental rights. In addition, the parties do not dispute that WCDSS and the Children's Cabinet provided Jacqueline with several resources to

help her reunite with her children. *See In re Parental Rights as to Bow*, 113 Nev. at 151, 930 P.2d at 1135 (Shearing, J., concurring) ("It is true that [the appellant] was poor at the time of termination, but it appears she squandered several opportunities given to her to escape poverty."). Unfortunately, not only did Jacqueline fail to make progress towards her case plan goals, she declined to take advantage of the resources made available to her to help her accomplish these goals. This includes Jacqueline's failure to: (1) find an apartment after receiving a Section 8 housing voucher from the Reno Housing Authority, (2) apply for Victims of Crime Act funds, or (3) submit the documentation for low-income energy assistance.

In addition, the record supports the district court's conclusion that Jacqueline failed to stay employed for any significant period of time, and that Jacqueline voluntarily left several jobs. To the extent Jacqueline struggled to maintain employment due to her anxiety, WCDSS referred Jacqueline to several mental health professionals for treatment. However, Jacqueline invariably failed to follow through with therapy.[4] Given the amount of time Jacqueline had to comply with her case plans and the services WCDSS provided to Jacqueline,[5] we hold there is substantial

---

[4]As such, we hold the district court's finding that Jacqueline failed to address her emotional and mental illnesses is supported by substantial evidence. We also note that Nevada law requires the district court to consider a parent's emotional and mental illnesses when evaluating a parent for neglect or unfitness. *See* NRS 128.106(1)(a) (stating "the court shall consider . . . . [e]motional illness, mental illness or mental deficiency of the parent which renders the parent consistently unable to care for the immediate and continuing physical or psychological needs of the child for extended periods of time").

[5]WCDSS also provided Jacqueline with several other services, such as: (1) the provision of funds for a temporary hotel room; (2) the provision

*continued on next page...*

evidence to support the district court's conclusion that Jacqueline's failure to reunite with her children was not the result of poverty and that she made only token efforts toward reunification.[6] Accordingly, we affirm the district court's order.

_____, J.
Parraguirre

We concur:

_____, J.
Hardesty

_____, J.
Stiglich

_____

...*continued*
of diapers, donated furniture, cleaning supplies, a vacuum, a baby play yard, a day planner, and bus passes; (3) referrals to charities for food, clothing, and diapers; (4) generating a list of job openings in the community and helping her create a resumé and apply for jobs; and (5) education and assistance regarding proper etiquette, hygiene, and appearance for interviews, including the provision of a gift card to purchase appropriate clothes.

[6]Jacqueline principally argues that the district court's finding of parental fault was improperly based upon her poverty. However, to the extent Jacqueline suggests that the best interests of the children were not served by termination, we hold that the district court's finding to the contrary is supported by substantial evidence. *See In re Termination of Parental Rights as to N.J.*, 116 Nev. at 795, 8 P.3d at 129.